UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In re:

BRAINER RICHARD and  Case No. 07-51319-wsd
BRAINER MAXINE,  Chapter 12
        Debtors.  Hon. Walter Shapero

_____/

## OPINION REGARDING VIOLATION OF STAY AND SANCTIONS FOR CREDITOR MISCONDUCT

The matters before the Court are Debtor's Motion for Finding of Violation of Stay as to GreenStone Farm Credit Services and Debtor's Motion for Sanctions.

**I.**

Debtors and GreenStone Farm Credit Services ("GreenStone") filed a Stipulation of Facts on October 18, 2008. Debtors subsequently stated that they do not completely agree with the Stipulation and have provided their own view of the facts in their brief, which was filed on November 5, 2008. The facts upon which the matter is being decided emanate from the signed stipulation of facts, which the Court concludes was intended to be the basis of the Court's decision, in lieu of an evidentiary hearing. In any event, the additional facts alleged in the debtor's brief would not make a difference in the result.

The debtors own and operate Brainer Greenhouses, Inc. The debtors obtained financing

from GreenStone in 2001. The loan was in the original amount of $938,238.00, with an adjustable interest rate. The loan provided that the debtors were required to make annual payments in the amount of $89,598.17, due July 1 of each year. Upon default, the loan agreement imposed an additional two percent interest rate.

The debtors' account went into non-accrual status on December 29, 2003. It never came out of non-accrual status prior to the bankruptcy or after the bankruptcy filing.

The issues in this case revolve around the facts that (1) GreenStone continued to charge the default interest rate before and after confirmation of the plan, and (2) GreenStone did not pay a Patronage Dividend to the debtors in 2007.

In regard to the default interest rate issue, the following stipulated facts are relevant. As stated above, the debtors' account went into non-accrual status on December 29, 2003 and is still in non-accrual status. Because the debtors' account has been in and is still in non-accrual status, GreenStone has been and is still charging the default interest rate.

The Order Confirming Plan states: "The July 2007 payment will be made no later than November 1, 2007, along with any applicable default interest charges. All GreenStone documents, policies and procedures will be honored and complied with. When applicable, unpaid default interest owing as of the Effective Date, if any, will be capitalized on to the loan. The date of capitalization will be the Effective Date." In addition, the Second Amended Plan was confirmed on June 18, 2008 and states in Article IV: "Any default of any debt is hereby waived or cured."

2

In regard to the Patronage Dividend, the following stipulated facts are relevant. The Patronage Dividend is not paid every year. In some years, it is not declared. The Patronage Dividend formula, if and when adopted by the Board of Directors, is for that year only. It is not a continuing resolution and does not carry forward from year to year. The Patronage Resolution applies to all GreenStone loans, whether or not the obligors are in bankruptcy, according to the terms of the formula set forth in the Patronage Resolution in accordance with GreenStone accounting requirements.

Under the 2007 Patronage Resolution, a borrower does not qualify for a Patronage Dividend unless there is positive interest income in excess of the marginal cost of the debt. Under applicable GreenStone accounting standards, payment received more than 90 days past due on non-accrual loans (whether or not the loan is in bankruptcy) is applied to reduce the recorded investment in the loan. Therefore, monies received on non-accrual loans are applied to reduce the principal balance and are not treated as interest income.

As stated earlier, the debtors' account has been in non-accrual status since 2003 and is still in non-accrual status. The debtors' July 1, 2007 payment was received by GreenStone on October 29, 2008. Since the payment received by GreenStone was applied to investment (because it is in non-accrual status and payment was made more than 90 days after the payment due date of July 1, 2007) rather than interest/income earned, there was no positive Net Interest Margin and therefore the loan did not qualify under the Patronage Resolution Formula. Pursuant to GreenStone's accounting requirements described above, the 2007 patronage payment was applied toward investment rather than interest/income earned and no Patronage Dividend was paid to the debtors for the 2007 fiscal year.

Debtors aargue that GreenStone violated (1) the terms of the Confirmed Chapter 12 plan; (2) the automatic stay; and (3) the anti-discrimination provisions of the Bankruptcy Code by continuing to charge the debtors the default interest rate and by failing to pay the debtors a 2007 patronage dividend.

**II.**

A. Violation of Chapter 12 Plan

Debtors argue that GreenStone's continued classification of their loan as being in non-accrual status, and therefore subjecting them to paying the default rate of interest, violates the Chapter 12 plan.

First, the Court must first look to the plan itself. Debtors' Chapter 12 plan seems to include an inconsistency with regard to the default interest rate.

Debtors' plan includes a general provision in Article IV which states: "Any default of any debt is hereby waived or cured." However, Article III of the plan, regarding the Treatment of Creditors was modified by the Order Confirming Debtors' Second Amended Plan. The treatment of GreenStone Farm Credit was modified to state:

> Payment will be made at the applicable rate in accordance with GreenStone rules and regulations. The July 2007 payment will be made no later than November 1, 2007, along with any applicable default interest charges. All GreenStone documents, policies and procedures, will be honored and complied with. When applicable, unpaid default interest owing as of the Effective Date, if any, will be capitalized onto the loan. If a patronage dividend is due, GreenStone may apply it to pay down the capitalized default interest or any other debt. The date of capitalization will be the Effective Date.

4

The most significant effect of this modification is that all payments must be made at the applicable rate in accordance with GreenStone rules and regulations and that all Greenstone documents, policies, and procedures must be followed and complied with. GreenStone argues that following their documents, policies, and procedures requires that the Debtors be subject to the non-accrual, default interest rate so long as they are in non-accrual status. Debtors failed to acknowledge this portion of the plan and rely solely on the provision stating that any default of any debt is hereby waived or cured.

Although there is an inconsistency here regarding the amount of interest GreenStone is permitted to charge, it is clear that the modification in the Order Confirming Debtors' Second Amended Plan supports GreenStones argument. Debtors have been in non-accrual status since 2003 and have not come out of non-accrual status since. Under the terms of the plan, debtors are required to make their payment in accordance with GreenStones rules and regulations. According to the Promissory Note between the debtors and GreenStone, debtors are required to pay an additional 2% interest upon default. GreenStone is simply continuing its relationship with the debtors under the agreed to terms of their promissory note and the terms of the plan.

The modification to the Debtors' Second Amended Plan clearly applies specifically to GreenStone's treatment under the plan. The general provision stating that any default of any debt is hereby waived or cured is inconsistent with the specific language in the modification of the plan. Since the language in the modification of the plan is more specifically aimed at providing for GreenStone's treatment and rights under the plan, the Court finds that GreenStone's actions do not violate the debtors' plan.

## B. Violation of Automatic Stay

The filing of a bankruptcy petition under Chapter 12 acts as an automatic stay that prohibits all entities from taking certain actions against the debtor and the debtor's property. 11 U.S.C. § 362. Specifically, creditors are prohibited from "any act to collect, assess, or recover a claim against the debtor that arose before commencement of the case." 11 U.S.C. § 362(a)(6). Debtors claim that GreenStone's application of the 2007 patronage payment to principal, instead of paying the amount to the debtors, violates the automatic stay. Debtors claim that GreenStone treated the debtors' account differently when determining whether or not debtors were entitled to a patronage payment in an attempt to coerce the debtors to repay their loan.

Under the 2007 Patronage Resolution, a borrower does not qualify for a Patronage Dividend unless there is positive interest income in excess of the marginal cost of the debt. Under applicable GreenStone accounting standards, payment received more than 90 days past due on non-accrual loans (whether or not the loan is in bankruptcy) is applied to reduce the recorded investment in the loan. Therefore, monies received on non-accrual loans are applied to reduce the principal balance and are not treated as interest income.

The debtors' account has been in non-accrual status since 2003 and is still in non-accrual status. The debtors' July 1, 2007 payment was received by GreenStone on October 29, 2008. Since the payment received by GreenStone was applied to investment (because it is in non-accrual status and payment was made more than 90 days after the payment due date of July 1, 2007) rather than interest/income earned, there was no positive Net Interest Margin and therefore the loan did not qualify under the Patronage Resolution Formula. Pursuant to GreenStone's

6

accounting requirements described above, the 2007 patronage payment was applied toward investment rather than interest/income earned and no Patronage Dividend was paid to the debtors for the 2007 fiscal year.

The Debtors stress that, although they were in non-accrual status in 2005 and 2006, they received 2005 and 2006 patronage payments. The Stipulation of Facts makes it clear that the Patronage Dividend Formula, if and when adopted by the Board of Directors, is for that year only. It is not a continuing resolution and does not carry forward from year to year. In addition, the Stipulation of Facts makes it clear that the Patronage Resolution was not adopted with reference to the Brainer account specifically. It was a general resolution applicable to all loans qualifying under the terms of the Patronage Resolution. In 2007, unlike in 2005 and 2006, Debtors were in non-accrual status *and* failed to make their payment within 90 days of the due date. It was a combination of these two occurrences which made the debtors unqualified to receive the 2007 patronage payment.

In addition, Debtors assert that Greenstone failed to pay the 2007 patronage dividend to the debtors in an attempt to coerce the debtors into paying the amount due on time. GreenStone argues that paying a patronage dividend to those clients that qualify under the formula is not an attempt to collect the debt owed, but rather an incentive to encourage clients to pay.

Debtors filed their bankruptcy petition on June 11, 2007, less than one month before their 2007 payment was due. Debtors made the July 2007 payment on October 29, 2007, which was more than three months after the original due date. Debtors insist that they were unable to make the July 2007 payment on time because they were prohibited from making the payment without

7

authorization from the court. GreenStone argues that it simply followed its patronage formula, which is applied regardless of the bankruptcy status of the client, when it determined that the Debtors did not qualify for the patronage payment. Greenstone insists that it did not take an affirmative step to collect any amount from the Debtors; rather, it followed its patronage dividend policies, which have the effect encouraging clients to pay in a timely manner.

Because GreenStone did not take any affirmative step to collect any amount from the Debtors, the Court finds that there has not been a violation of the automatic stay. The automatic stay, one of the vital protections afforded to a debtor in bankruptcy, serves several fundamental functions including protecting debtors from further collection efforts by their creditors, ensuring an equitable distribution of assets, and ensuring that repayment of debts will be carried out in an orderly fashion. In this case, GreenStone took no affirmative action to collect the July 2007 payment from the Debtors. In addition, since GreenStone will be paid in full over the life of the plan, its application of the patronage payment to reduce the principle balance on the account rather than paying the patronage dividend to the Debtors has no significant effect on the equitable distribution of assets. Therefore, GreenStone's failure to pay the patronage dividend to the Debtors does not constitute a violation of the automatic stay.

### C. Discrimination under 11 U.S.C. § 525

*i. Government Unit*

Debtors argue that GreenStone's actions discriminate against the debtors in violation of 11 U.S.C. § 525(a). In order to determine whether or not GreenStone's actions discriminate against the debtors, the Court must first determine whether GreenStone qualifies as a

8

"government unit."

Section 525(a) states, in relevant part:

> [A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

Section 525(a) "helps to ensure the 'fresh start' policy of the Code by prohibiting governmental entities from refusing to deal with or denying a certain property interest to a debtor due to his or her bankruptcy filing." *See In re Oksentowicz*, 314 B.R. 638, 639 (Bankr. E.D.Mich 2004) (citing *In re Valentin*, 309 B.R. 715, 720 (Bankr. E.D.Pa. 2004)).

The Bankruptcy Code defines "governmental unit" as "United States; State; Commonwealth; District; Territory; municipality; or instrumentality of the United States . . ., a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." 11 U.S.C. § 101(27). The legislative history of § 101(27) indicates that "governmental unit" is defined in the broadest sense. "Department, agency, or instrumentality" does not include an entity that owes its existence to State action, such as the granting of a charter or a license but that has no other connection with a State or local government or the Federal Government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function. S.

9

Rep. No. 95-989, at 24 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810; *see also* H. Rep. No. 95-595, at 311 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6268.

Debtors argue that GreenStone is a "governmental unity," but fail to cite any authority that stands for the proposition that § 525(a) applies to Greenstone. GreenStone argues that it is not a "governmental unit" because of its cooperative status, its board of directors, and the fact that it is subject to independent audits, which are characteristics that more closely align it with entities that courts have determined to be outside the scope of § 525(a).

In 2004, this Court held that a privately owned apartment complex, which participated in a subsidized housing program regulated by the federal government, was a "governmental unit" subject to § 525(a). *In re Oksentowicz*, 314 B.R. 638 (Bankr. E.D. Mich. 2004). "The few cases that had addressed the issue [had] held that such an arrangement does not transform the private entity into a 'government unit.'" *Id. citing Stoltz v. Brattleboro Housing Authority (In re Stoltz)*, 315 F.3d 80, 90 n. 5 (2d Cir. 2002); *In re Liggins*, 145 B.R. 227, 232 (Bankr. E.D. Va. 1992). However, the Court held that where there is significant entwinement with governmental policies, management, and control, a seemingly private entity can be transformed into a "governmental unit." *Id.* at 641. However, entities which merely receive public funds and are subject to governmental regulations may not necessarily qualify as a "governmental unit." *Id.* at 642. The deciding factor is the degree of governmental involvement and control.

Therefore, to determine whether an entity qualifies as a "governmental unit," it is important to determine whether the entity is performing a traditional and important governmental

function and whether there is evidence of "entwinement" with governmental policies, management, or control.

GreenStone is a Farm Credit Association which is part of the Farm Credit System. The Farm Credit Agency ("FCA") is an independent agency of the executive branch of the federal government. It supervises and coordinates the Farm Credit System, which is a centralized banking system designed to serve U.S. agricultural interests by granting short and long term credit through regional banks and local associations. Although initially capitalized by the federal government, the banks and associations that make up the Farm Credit System are now financed entirely through stock that is owned by members, borrowers, or the associations. The FCA ensures the safe operation of these lending institutions and protects the interests of their borrowers.

The FCA derives its authority from the Farm Credit Act of 1971. 12 U.S.C.§ 2241 et seq. The FCA examines the lending institutions that constitute the Farm Credit System to certify that they are sound. The FCA's Board of Directors, made up of three full-time Board members, manages, administers, and establishes the policies of the FCA. It also ensures compliance with the regulations under which the Farm Credit institutions operate. To that end, it is authorized to issue cease and desist orders, levy civil monetary penalties, remove officers and directors, and impose financial and operating requirements. It may directly intervene in the management of an institution whose practices violate the Farm Credit Act or its regulations. It may also step in to correct an unsafe practice or to assume formal conservatorship of an institution.

Clearly, GreenStone, as a Farm Credit Association, is subject to the FCA's authority. To determine whether or not GreenStone qualifies as a "governmental unit," the Court must first determine whether GreenStone is carrying out a governmental function. GreenStone carries out a governmental function similar to the federally subsidized apartment complex in *In re Oksentowicz*. In *In re Oksentowicz*, the court found that the apartment complex was performing a traditional and important governmental function of providing subsidized low income housing while under the direct control of HUD. Similarly, GreenStone is performing a traditional and important government function when it assures farmers the opportunity to borrow money, at minimum interest rates, under the direction, supervision, and with the aid of the government. GreenStone clearly carries out a governmental function.

The next step in determining whether GreenStone qualifies as a "governmental unit" is for the Court to determine whether there is evidence of "entwinement" with governmental policies, management, or control. As part of the Farm Credit System, GreenStone is subject the FCA's oversight, policies, and regulations. Although GreenStone points out that it is owned by its membership, who elects a Board of Directors to provide direction and oversight, the FCA may remove any officers or directors and impose financial and operating requirements when it sees fit. In addition, the FCA establishes the policies that the members of the Farm Credit System are required to follow and may directly intervene in the management of an institution whose practices violate the Farm Credit Act or its regulations. GreenStone also argues that, in addition to strong internal controls, it is audited by an independent auditing firm and is regulated by the FCA. Although it is clear that there are some aspects that would make GreenStone seem like an independent entity, the high level of management, regulation, and control that the FCA

12

exerts over members of the Farm Credit System suggest that there is evidence of significant entwinement with governmental policies, management, or control. Therefore, the Court finds that GreenStone is a "governmental unit" subject to § 525.

*ii. Discrimination*

Congress originally enacted § 525 to provide the debtor with anti-discrimination protection. Congress prohibited discriminatory conduct that frustrated the rehabilitative goals of bankruptcy – giving the debtor a fresh start. Federal court application of the anti-discrimination protection in § 525 covers a wide range of governmental conduct. Conduct deemed to warrant debtor protection includes: withholding college transcripts by public institutions, excluding bankruptcy debtors from student loan guarantee programs, refusing participation in the contract bidding process by governmental entities, refusing to grant a state license, evicting a discharged debtor from municipal housing, and participating in governmental home mortgage finance programs. *See, e.g. In re Heath*, 3 B.R. 351 (Bankr. N.D. Ill. 1980); *In re Goldrich*, 45 B.R. 514 (Bankr. E.D. N.Y. 1984); *In re Son-Shine Grading, Inc.*, 27 B.R. 693 (Bankr. E.D. N. Car. 1983); *In re Anderson*, 15 B.R. 399 (Bankr. S.D. Miss. 1981); *In re Gibbs*, 9 B.R. 759 (Bankr. D. Conn. 1981). The debtors have cited no authority that would tend to suggest that GreenStone's failure to pay the 2007 patronage payment to the debtors would be covered within the confines of §525.

The plain language of § 525 states:

[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or similar grant to, condition such a grant to, discriminate with respect to such a grant against . . . a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with

13

whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act."

The language of the statute and the case law derived from it suggest that § 525 was enacted to prevent "governmental units" from discriminating against bankrupt debtors in terms of granting, refusing to grant, or revoking licenses, permits, charters, franchises, or similar grants.

Debtors argue that the legislative history of the statute shows that Congress intended this provision to be broad in scope, and to change to meet new forms of discrimination by governmental or quasi-governmental units. Debtors cite the following section of the 1978 Act Revision Notes and Legislative Reports for their assertion:

> The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a State bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union.

However, even this legislative history seems to limit the scope of § 525 to governmental organizations that perform licensing functions or that have some significant effect on the debtors' livelihood. Clearly, GreenStone does not perform any licensing function. Although Debtors' may believe that GreenStone's actions seriously affect their livelihood or fresh start, the Court does not agree. GreenStone's failure to pay the patronage dividend to the debtors cannot be considered to be at the same level as those actions deemed to warrant protection under § 525 because the action does not seriously affect the debtors' livelihood or fresh start.

In addition, even if GreenStone's actions can be considered to seriously affect the

14

debtors' livelihood or fresh start, the Court must consider whether GreenStone actually discriminated against the debtors. Debtors argue that GreenStone did not pay the 2007 patronage payment to them because they had filed bankruptcy. Debtors assert that GreenStone paid the 2005 and 2006 patronage payments while they were in non-accrual status, but failed to pay the 2007 patronage payment on the same terms. GreenStone argues that it did not treat the Debtors differently because they were in bankruptcy. Rather, they did not pay the 2007 patronage payment to the debtors because, unlike in 2005 and 2006, the debtors were in non-accrual status *and* failed to pay within the 90 days following the July 1 due date. As established earlier, the Debtors simply did not qualify for a 2007 patronage payment under the terms of GreenStone's Patronage Dividend Formula.

The Court finds the fact that GreenStone's policies with regard to patronage payments apply to all accounts, regardless of whether or not the borrowers are in bankruptcy significant. This Court finds that GreenStone has not discriminated against the Debtors in violation § 525. Although GreenStone's policies may have had a less than desirable effect on the debtors, GreenStone's actions do not amount to discrimination under § 525.

## III.

Accordingly, Debtor's Motion for Finding of Violation of Stay as to GreenStone Farm Credit Services and Debtor's Motion for Sanctions are denied.

The Court will enter an order contemporaneously herewith.

**Signed on June 11, 2009**

                                            **/s/ Walter Shapero**
                                            **Walter Shapero**
                                            **United States Bankruptcy Judge**